### HOME BUILDING & LOAN ASS'N et al. v. WHITE et al.

No. 19080.   Opinion Filed Feb. 11, 1930.

Commissioners' Opinion, Division No. 1.

Albert H. Bell and Ray S. Fellows, for plaintiffs in error.

Bailey E. Bell and Albert A. Hughes, for defendants in error.

TEEHEE, C.   Plaintiffs in error, C. A. Mayo and J. D. Mayo, on November 3, 1923, sold a lot in the city of Tulsa to the defendants in error A. W. Hodges and Eva Hodges, husband and wife, for $1,000, of which consideration $950 was covered by a purchase money mortgage.   On the lot the Hodges constructed a three-room house, and on November 14, 1923, gave a mortgage for $1,250 on the property to the plaintiff in error, Home Building & Loan Association, which mortgage was considered by the parties to these transactions as superior to the purchase mortgage.

On August 20, 1926, and continuing to October 16, 1926, the Hodges, by reconstruction, converted the original house into what is known to the building trade as a "duplex," the same being a two four-room apartment house with separate entrances and modern in its conveniences.   In this reconstruction the defendants in error J. F. White, B. T. Williams, H. F. Anderson, Berry Carter, C. C. Steward, L. T. Holland, A. L. True, C. N. Sniveley, R. A. Steward, Fred Ramey, and M. A. Barbour, performed labor, and the defendants in error Tyler Cabinet & Mill Works & Independent Material & Supply Company furnished materials.   The laborers and materialmen filed liens against the property.

On December 22, 1926, J. F. White filed this suit in foreclosure of his lien, naming all of the other parties as defendants, whereupon all the other lienors, including the mortgagees, sought foreclosure of their respective liens.

On July 25, 1927, the cause was tried to the court, resulting in a judgment against

the Hodges, the owners of the property, and of foreclosure of the various liens, with the laborers' liens ranking the mortgage liens upon the property, and with the materialmen's liens as junior to the mortgage liens. This priority given to the laborers' liens by the court is assigned as error by the Home Building & Loan Association and the Mayos, mortgagees. plaintiffs in error here.

In their brief plaintiffs in error say:

"In marshaling these liens, the court doubtless construed sections 7468 to 7472, inclusive, C. O. S. 1921, which provides for the lien of a laborer on the production of his labor, and section 7472, which provides that such lien shall take precedence over all other liens, whether created prior or subsequent to the laborer's lien thereby created.

"It is the contention of these plaintiffs in error, the holders of said mortgages, that neither the lands in question, nor the residence thereon located, were at the commencement of this suit, or at the time of filing the liens, the production of the labor of these mechanics. and that is the sole issue presented by this appeal."

Of the sections named, section 7468 is the controlling provision. This provides as follows:

"Laborers who perform work and labor for any person under a verbal or written contract, if unpaid for the same, shall have a lien on the production of their labor, for such work and labor; Provided, that such lien shall attach only while the title to the property remains in the original owner."

Section 7469 provides that the lien "may be enforced as in an ordinary action or by attachment proceeding as provided in the Code of Civil Procedure." Section 7470 provides that such lien "shall be in full force and effect from and after the time the labor is performed." Section 7471 provides that foreclosure of such lien "shall be commenced within eight months after the work is done." And section 7472 provides that:

"Liens created under this act shall take precedence over all other liens whether created prior or subsequent to the laborer's lien herein created and provided."

These provisions of law were enacted as chapter 114, S. L. 1911, and constitute what is known as the Laborers' Lien Law.

The theory on which plaintiffs in error proceed in their argument is that the lien claimants at the bar are not "laborers," and that as the improvements on which they bestowed their labor were but additions to a prior completed building, and thus became a part of the land on which they were placed, neither such improvements nor the improved property can be said to be the "production of their labor," within the meaning of the law on which the judgment of the court was predicated.

Under the first phase of their theory, plaintiffs in error contend that the term "laborer" has a well-defined meaning in the field of lien law, and as here used means "one who labors in a toilsome occupation—a man that does work that requires little skill, as distinguished from a mechanic," and therefore that, as the record shows these lien claimants to be mechanics, several or them being carpenters, and among the others being a bricklayer, a painter and paper-hanger, a cement worker, a floor layer and finisher, and a plumber. that is to say, skilled laborers as distinguished from unskilled laborers, they accordingly are not of the class to whom is given the lien by said provisions of law, and for that reason are not entitled to liens superior to the mortgage liens which were in existence and of record prior to the performance of labor by them on the property sought to be impressed with such liens. In this contention they rely principally on the case of Dano v. M., O. & G. R. Co., 27 Ark. 564, and other cases from the Arkansas court which followed the ruling of that case.

In the Dano Case, the plaintiff sought to establish a laborer's lien upon certain grading or roadbed of the defendant railroad company. The action was predicated on labor claims assigned to him. The controlling statute there provided as follows:

"That all laborers, who shall perform work and labor for any person under a written or verbal contract, if unpaid for the same, shall have an absolute lien on the production of their labor for such work and labor."

Addressing itself to the class of persons covered by the statute, the court used this language:

"The language of this section is broad and comprehensive and defines, concisely, the nature and character of the lien and establishes the right of the laborer to resort to it. It says all laborers doing any work, under written or verbal contract, shall be entitled to a lien on the production of their labor.

"In what sense did the Legislature use the word 'laborers' is one question which presents itself to our mind. Webster says, 'a laborer is one who labors in a toilsome occupation—a man who does work that requires little skill, as distinguished from an artisan.' We will assume, inasmuch as there was, prior to the passage of the act of July 23, 1868, a law protecting that class of laborers coming under the head of artisans, that the word 'laborer,' as used in the statute now under consideration, by the Legislature, was intended to be understood according to its

common acceptation, and as defined by Webster."

It is clear from that discussion that the court thus limited the term "laborers" to the definition thereto given by the lexicographer for the reason that there was another provision of law "protecting that class of laborers coming under the head of artisans." This is tantamount to the proposition that, in the absence of a statutory distinction, mechanics, or skilled laborers, as they are often designated. come within the term "laborers," under a liberal interpretation of lien laws, which is the rule in our state. Many other cases will be found in the books which have given to the controverted term a restricted meaning as in the Dano Case. Likewise, many cases will be found in which it has been held that the term was inclusive of other classes of the building trade than those as defined in the Dano Case. In illustration, see Gould v. McCormick, 75 Wash. 61, 130 Pac. 676, 47 L. R. A. (N. S.) 765, Ann. Cas. 1915A, 710. Of all of such cases it may be said that a limited or a broad application of the term. as the case may be, was governed generally by the relation of the statute involved to other provisions of the lien law of the particular jurisdiction, as where there may have been a legislative classification

In the law under consideration, there is no distinction in terms made between skilled laborers and unskilled laborers, nor is there such a distinction in our general lien law as by special classification, such as mechanics, builders, artisans, workmen, laborers, and the like, as in the case of our provisions of the railroad lien law. The adjudications relied on by plaintiffs in error, therefore. cannot be regarded as decisive of the point.

Subsequent to the lodgment of this appeal, this court, in Morley v. McCaskey, 134 Okla. 50, 270 Pac. 1107, which involved several classes of the building trade in respect to priority of their liens as against a prior mortgage lienor, defined the term "laborers," as used in said section 7468, in paragraph 5 of the syllabus, as follows:

"The term 'laborers,' as used in section 7468 C. O. S. 1921, is intended to designate persons without particular training who are employed at manual labor under a contract terminable at will; that is, common laborers, or those who are required to use their hands or muscles in actual work. The term is not intended to include those persons who agree with the original contractor to furnish the material and construct for him some designated part of the structure which the original contractor has agreed to erect for the owner. Such persons are subcontractors, and their liens are provided for by section 7463, C. O. S. 1921." .

In the body of the opinion, the court used this language:

"A laborer ordinarily is a person without particular training and who is employed at manual labor under a contract terminable at will. We are of the opinion that the words 'laborers who perform work and labor.' used in section 7468, supra, are intended to designate ordinary laborers who perform actual physical toil; common laborers and those who are required to use their hands or muscles in actual work. Such words do not apply to those who furnish labor and material under a contract to perform a designated portion of an entire contract. The purpose of the statute is to protect a class of persons rarely able to protect themselves, and who, from the laborious nature of their occupations and the necessity of earning their daily bread by daily toil, have not time, opportunity, or training sufficient to inform themselves as to the financial responsibility of the parties for whom they work. It is such persons who work under a contract terminable at will, who are in danger of being discharged without receiving their compensation, and who need this unusual and strong means of enforcing their rights by an ordinary action or by attachment proceedings. It does not seem probable that the Legislature should provide such extraordinary power for collection of compensation for his services to a contractor. who was adequately protected under sections 7461 and 7463, supra."

In that case, it was also held in paragraphs 1 and 2 of the syllabus. to wit:

"1. Under section 7468, C. O. S. 1921. laborers who perform work and labor for any person under a verbal or written contract, if unpaid for the same, shall have a lien on the production of their labor, but such lien attaches only while the title to the property remains in the original owner. Such lien takes precedence over all other liens whether created prior or subsequent to such laborer's lien."

"2. Liens of mechanics and materialmen, as provided for by sections 7461, 7462, and 7463, C. O. S. 1921, are enforceable against both the real estate and the improvements thereon, but are prior only to other liens which attach subsequent to the commencement of such work."

In paragraph 2, by the use of the term "mechanics," it would seemingly appear that the term was used as by special classification of that class of laborers recognized in the building trade as skilled laborers, who therefore would not come within the definition of laborers given in paragraph 5 and included in the class designated in paragraph 1. Upon examination of the record in the

case, and as is shown by the opinion, the term "mechanics" in paragraph 2 had reference to that class of claimants who had contracted both to furnish materials and to perform labor for the completion of certain portions of the improvements involved in the litigation and there classified as subcontractors in contradistinction to those who were in fact skilled laborers and had performed work and labor thereupon, as of the class brought under paragraph 1 and defined in paragraph 5 there were carpenters, a painter, and a plasterer, or, in other words, they were skilled laborers—and a skilled laborer is a mechanic. Merrigan v. English, 9 Mont. 113, 22 Pac. 454, 5 L. R. A. 837.

It therefore would appear to be clear that in the Morley Case, it was not the intention of the court to hold that one who may be classified as a mechanic or skilled laborer and performed work and labor in the construction of a building on real property would be precluded from the benefits of a lien upon the production of his labor as provided for in the Laborers' Lien Law. As was said in Adams v. Goodrich, 55 Ga. 233:

"Although the plaintiff was a mechanic, he was a laborer within the true intent and meaning of the statute, and was entitled to a lien on the property of his employer. A contractor may be a mechanic, but if he does not perform manual labor he is not entitled to a laborer's lien on the property of his employer. So a laborer may be a mechanic, and if he performs manual labor as such mechanic, he is entitled to a laborer's lien on the property of his employer. A laboring mechanic who performs actual manual labor for his employer, is as much entitled to a laborer's lien on his property for the value of the labor performed by him, as any other class of laborer."

It cannot be gainsaid that the lien claimants at the bar performed work and labor on the improvements involved in this litigation, and the fact that such service may have been directed and rendered more valuable by special training or mechanical skill did not take away from such service physical toil, the main ingredient, which is the basis of the interpretation of the term "laborers" in the Morley Case.

There being no distinction made in said section 7468 as between skilled laborers and unskilled laborers, and no language in the law indicating a legislative intent that the term should be given a restricted or limited meaning, as is contended for by plaintiffs in error, we are of the opinion, under our rule of liberal construction of lien laws,

that the term "laborers" used in said provision of law is inclusive of both skilled laborers and unskilled laborers who perform work and labor as there provided. It therefore follows that as the lien claimants performed work or labor on the improvements mentioned, they are entitled to a prior lien thereon, if such improvements may be said to be the production of their labor.

On this latter phase of the case, plaintiffs in error say:

"The word 'product' imports an article which is made of something, and which, when made, has characteristics which are apparent to the sense."

This is to say that the lien attaches only upon personal property. They here also rely principally on the Dano Case, and on section 8394, C. O. S. 1921, and related sections, which provisions of law define and classify property as real and personal. In this particular the general contention, in effect, is that the constituent elements of the improvements, the material furnished by the materialmen, upon assemblage and conversion lost their quality of personal property by merger with the land whereon they were placed, in the absence of a provision in the law authorizing a lien upon the improvements independently of the land; it cannot be maintained that either the improvements, or the land thus improved, is the production of the labor of the lien claimants at the bar.

It may not be regarded as settled law in this state that a laborer's lien, under the Laborers Lien Law, does not extend to the land upon which improvements are placed. Morley v. McCaskey, supra. The gist of that case upon this point is that a laborer's lien under the Laborers Lien Law attaches to the improvements constructed on land under mortgage at the time of construction, which improvements represent the production of the claimant's labor, while the title to the property remains in the original owner, but does not attach to the land on which such improvements are placed, and as to such improvements it is a superior lien to a prior mortgage lien on the realty.

The question hereunder, therefore, is resolved into the proposition of whether or not the improvements involved in this litigation can be said to be the production of the work and labor of the lien claimants within the meaning of the relevant law. In this respect it is urged that the improvements on which the lien claimants bestowed their labor were additions to or alterations of the original building constructed three years

prior to such latter improvements, and thus, in effect, resulted in an enlarged or altered or repaired building, for which reason, under the principle of confusion, it cannot be said that such improvements were the production of their labor, whereas, on the other hand, it is contended by defendants in error that the improvements involved constituted a new building, and were thus brought within the purview of the law.

The rule of test of the respective contentions of the parties is well stated in Warner v. Freeman, 187 Pa. 455, 51 Atl. 290, 67 A. S. R. 583. In that case the statute within the purview of which the plaintiff sought to bring his case provided for a lien in the erection and construction of a new building. The lien was denied on the ground, that the improvements made constituted alterations or repairs. The rule of distinction was stated as follows:

"Under a statute giving a lien for work done or material furnished in erecting a building, the lien cannot be enforced for alteration or repairs, but if the structure of the building is so completely changed that in common parlance it may properly be called a new building or a rebuilding, it comes within the statute. Newness of structure in the main mass of the building, an entire change of external appearance which denotes a different building from that which gave place to it, though some parts of the old may have entered into it, is what constitutes a new building, as distinguished from one altered or repaired."

The question, therefore, is one of fact and must be determined from the nature and character of the improvements made. Armstrong v. Ware, 20 Pa. 519. What then are the facts in respect to the improvements?

The original building was 22 by 24 feet, consisting of three rooms and a small closet. There was one partition wall across the width of the building and one across half the length. The floor plan was extended by 14 feet at the front and 8 feet at the back, with the front extension being 26 feet wide and made into two living rooms 13 by 14 feet. The original space was converted into two bedrooms 11 by 12 feet, with a closet to each 3 by 4 feet, and two kitchens 9 by 10 feet, with a sink and a built-in cabinet to each. The back extension was made into two breakfast rooms 7 by 8 feet, and a connecting bathroom 6 by 2 feet. As to how much of the old building was torn down in this change is best shown by the record, from which we quote:

"Q. How much of the old building was torn down— * * * A. Well, the entire roof was taken off of it; all the siding was taken off of the front and lathed and plastered where the siding was, and we had to cut so many openings through it that it was cut up so that we tore all the plaster off on the inside of that wall; and we cut openings through the center wall running north and south, tore the clothes closet out that was in there and built in two more, and tore the siding off of the west wall, the entire siding and lathed and plastered that wall, and then we cut openings in the front. It had just a low narrow window, single sash stationary, and we taken that out and cut it and put in a double window on the porch side, and cut the hole here on both sides. Q. Is that the north or south side of the house (indicating)? A. Yes, sir, on the north side of the house. Cut it out and put in a window and a door. All the windows on the north side was small windows, and we took it out and put larger windows in, and there was windows on the south side, but we had to put a door in the south and the north both. Q. Then what was left of the old house then, Mr. Steward, when you got done? A. There wasn't a great deal. *** Q. Well, what was left, in detail; was the roof left? A. No, sir. * * * Q. What walls were left, Mr. Steward? * * * A. The studding was left in the east wall and the front. Well, there was two holes cut with a door that was put in afterwards; and the south wall was all left and the north wall was all left, and the center wall running north and south had two openings cut out in it, but it was left standing. Q. You mean left standing, Mr. Steward, you mean that the plastering was left on the studding? A. The plastering was left in that wall. Then the back partition running east and west through the back part of the house was not molested. Q. You have stated what was done with the roof? A. The roof was tore off and a new one was put on."

From this evidence it is not difficult to see that, in the place of the original building, by the improvements described, there arose a new building entirely different from the original in appearance, consisting of two four-room apartments known to the building trade as a "duplex," modern in its appointments and conveniences. Under the rule of test, therefore, the improvements made by these lien claimants constituted a new building, that is to say, a finished product which was the production of their labor. Ward v. Crane, 118 Cal. 676, 50 Pac. 839; Hershey v. Shenk, 58 Pa. 382; Armstrong v. Ware, supra.

But the plaintiffs in error further urge that if these improvements are held to be the production of their labor, as the lien claimants were charged with notice that

plaintiffs in error were the holders of subsisting mortgage liens upon the original building, and though the parties to both sides of the case be considered without fault, a proper assumption under the record, under the principle that where one of two parties is compelled to suffer loss the law directs that he who in the greater degree made the loss possible must sustain it, and the lien claimants being thus responsible, priority of their claims should have been denied. This presents the Gordian knot in this case. In the Morley Case and prior cases therein cited, this element was not present, as the improvements there, as has been noted, were original improvements placed on land covered by a prior mortgage lien, hence the rule there laid down in this relation cannot be said to be decisive of the point, as is asserted by defendants in error.

There is a well-established principle that a contract is made with reference to the law in force at the time of its execution. Oklahoma Cotton Growers Ass'n v. Salyer, 114 Okla. 77, 243 Pac. 232; Farley v. Board of Education, 62 Okla. 181, 162 Pac. 797. This has been held to apply to a mortgage. Hicks v. Scofield, 121 Mo. 381, 25 S. W. 755. The rule was applied there as follows:

"The lien law enters into a mortgage subsequently made, in respect of property to which that law applies, but the priority of a mechanic's lien upon buildings as against the holder of an earlier incumbrance must be established in the mode prescribed by the law."

The principle is here applicable. Both parties therefore stand on an equal footing before the law, the defendants in error being charged with notice of the mortgage liens, and the plaintiffs in error with knowledge that under the Laborers' Lien Law a lien may be created and declared to be superior to a mortgage lien in the contingencies therein named. Thus equities here arise that call for adjustment.

The rule to be applied in this adjustment of the equities of the parties is well stated in Abraham F. Croskey v. Northwestern Mfg. Co., 48 Ill. 481, to wit:

"The rule for adjusting the different rights of parties holding separate liens upon property, which is sought to be subjected to the payment of a mechanic's lien, is, that an incumbrance anterior to the mechanic's lien, takes priority over it, to the extent of the value of the property at the time the mechanic's lien attached, and the mechanic's lien takes priority over the mortgage only to the extent of the additional value given to the property by the improvements."

This is to say, the values must be determined as of the time the improvements were commenced and at the completion thereof. Applying the principle of this rule to the case at bar, of necessity the value of the original building and the value of the new building must be ascertained as a basis of adjustment.

This rule of adjustment of equities was applied in Wimberley v. Mayberry, 94 Ala., 240, 10 So. 157, 14 L. R. A. 305, the court holding:

"A mechanics' lien or the completion of a building partly erected on mortgaged premises is superior to the mortgage as to what is added by the lienor but inferior to it as to what was previously covered by the mortgage, under Code sec. 3018, providing for such liens 'to the extent in ownership' of the person who creates the lien, and sec. 3019, giving them priority as to the land over liens, mortgages, and incumbrances created after the work commences and 'as to the building or improvement' over all other liens, etc., whether prior or subsequent."

In principle we see no difference between our statute and the one there, which provided for a lien "to the extent in ownership," as in our case the lien attaches "while the title to the property remains in the original owner." In that case the facts were that a dwelling house, on which there was a mortgage lien of $4,000, was partially destroyed by fire. The mortgage provided that the property should be insured for the benefit of the mortgagee. Two thousand, six hundred and sixty-four dollars was realized from the policy of insurance. By agreement the mortgage permitted the owner of the property to use the insurance money in rebuilding the dwelling, it being the agreement that the new building should stand in the place of the burned building, and be subject to the mortgage in the same manner. The insurance money was so expended without completing the structure, and, without the consent or knowledge of the mortgagee, the mortgagor incurred further indebtedness in the completion thereof in the amount of $600, in which sum the trial court decreed a prior lien upon the new building. In addressing itself to the question of priority, the court observed:

"There was no injustice or injury in giving to mechanics and materialmen a prior lien upon buildings or improvements wholly erected by them against existing mortgages or liens, or in declaring a prior lien upon the land as against the mortgages and liens subsequently obtained. As against a prior mortgage or incumbrance of the land, the equity and policy of the statute which se-

246

cures the mechanic's and materialman's lien rests upon the principle that no injustice is done in preventing the holder of the older lien from appropriating the labor and material of others, by which his security is enhanced, without compensation. It would be inequitable to hold that a mechanic or materialman can appropriate, as compensation for his labor and material, the estate of an innocent prior mortgagee; or, as was forcibly stated in Welch v. Porter, 63 Ala. 232, 'to hold that a subsequent contractor or materialman could acquire a lien which would take precedence over an intervening incumbrance * * * would shock the moral sense of the profession, and fail to carry out the intention of the Legislature.' The purpose of the act was to intervene in favor of the mechanic or materialman, and secure to him a paramount lien upon what he put upon the land in the way of 'buildings or improvements or repairs thereto,' and to prevent the operation of the common law, which, without the act, would give an existing mortgage or lien a priority over it. The property improved in such cases merges into the realty, but subject to the mechanics' lien to the extent of the value of the improvements. It was to protect those by whose labor and materials the value of the property was increased as far as possible, to the extent of the enhanced value of the property."

In the circumstances of the case in hand, application thereto of the principle of the rule of these cases, we think, will best accomplish the purpose of the law, for, as we see it, the underlying motive of the law was to prevent the inequity of one enjoying the handiwork of another without recompense. The law does not go beyond the constitutional guaranty to secure unto the laborer his right to the enjoyment of the fruits of his own industry, nor does it deprive another of his right of property likewise secured unto him.

It is our opinion, therefore, that the defendants in error have a superior lien to the mortgage liens in the improvements involved to the extent of the value of the new building over and above the value of the original building at the time of the commencement of such improvements. As the record in respect to such values is incomplete, adjustment of the equities of the parties by modification of the judgment in the case cannot be had in the appellate court.

The judgment of the district court is therefore reversed, and the cause remanded, with directions to the district court to ascertain the values referred to, and thereupon adjust the equities of the parties, and enter judgment fixing the priority of their respective liens not inconsistent with this opinion.

HALL, HERR, JEFFREY, and DIFFENDAFFER, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) 18 R. C. L. p. 914; R. C. L. Perm. Supp. p. 4548. (3) 18 R. C. L. p. 952. See "Mechanics' Liens," 40 C. J. §41, p. 68, n. 67; §141, p. 129, n. 20; §369, p. 289, n. 19; p. 290, n. 23; §397, p. 305, n. 92.